**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AXXIOM MANUFACTURING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-3735 |
| | § | |
| MCCOY INVESTMENTS, INC. d/b/a | § | |
| FORECAST SALES, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Axxiom Manufacturing, Inc. has sued McCoy Investments, Inc. d/b/a Forecast Sales ("Forecast"), alleging copyright infringement, in violation of 18 U.S.C. § 501; unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125; and unfair business practices under Texas law.[1] (Docket Entry No. 27). The parties have cross-moved for partial summary judgment on the copyright-infringement claims, (Docket Entry Nos. 49, 94), and Forecast has moved for partial summary judgment on the Lanham Act and state-law claims, (Docket Entry No. 62).[2] Forecast also has moved to strike certain evidence, (Docket Entry No. 67), for leave to designate responsible third parties, (Docket Entry No. 95), and to exclude the expert testimony of certain Axxiom witnesses, (Docket Entry Nos. 98–100).

---

[1] Axxiom also sued Ronald S. Rogeou, Jr., a former Axxiom employee. Axxiom has since settled its claims against him. (Docket Entry No. 91).

[2] Forecast also moved for partial summary judgment on a trade-dress claim that, as Axxiom points out, is not asserted. (Docket Entry No. 68). Forecast has since moved to withdraw that motion. (Docket Entry No. 76). The motion is granted. Forecast's motion for partial summary judgment on this nonexisting claim, (Docket Entry No. 68), is terminated as moot.

Based on the motions and numerous related filings, the record, and the applicable law, this court orders as follows:

- Forecast's motion for partial summary judgment on the copyright-infringement claims, (Docket Entry No. 94), is granted.  Axxiom's cross-motion, (Docket Entry No. 49), is denied.

- Forecast's motion for partial summary judgment on the Lanham Act and state-law claims, (Docket Entry No. 62), is denied.

- Forecast's motion to strike certain evidence, (Docket Entry No. 67), is denied.

- Forecast's motion for leave to designate responsible third parties, (Docket Entry No. 95), is granted in part.

- The court reserves ruling on Forecast's motions to exclude expert-witness testimony, (Docket Entry Nos. 98–100), until the discovery hearing to be held on February 1, 2012.

The reasons for these rulings are explained below.

I.      **Background**

A.      **Axxiom**

Axxiom designs, manufactures, and markets abrasive-blasting products under the Schmidt brand name.  These products include the Schmidt Thompson Valve, the Schmidt Micro Valve, and the Schmidt Combo Valve.  (Docket Entry No. 49, ¶ 1.2).  The Schmidt brand originated with Schmidt Manufacturing, Inc., a predecessor company that also designed, manufactured, and marketed abrasive-blasting products, including the Thompson Valve and the Micro Valve.  In 1997, U.S. Filter, Inc. acquired Schmidt.  Six years later, in 2003, U.S. Filter sold Schmidt's intellectual property to International Surface Preparation Group.  That same year, Axxiom was formed.  Axxiom purchased certain Schmidt assets and licensed Schmidt's intellectual property from International

Surface.  In 2006, Axxiom purchased Schmidt's intellectual property.  (Docket Entry No. 61, Ex. L, ¶ 2).[3]

In 1987, Schmidt published an Operating and Maintenance Manual for its 1.5, 3.5, 6.5, 10 & 20 Cu. Ft. Portable Pressure Blasters.  (Docket Entry No. 94, Ex. A).  This manual included exploded-parts hand drawings of the components comprising the Thompson Valve, the Micro Valve, and the Combo Valve.  Each drawing had component-part descriptions and numbers.  (*Id.*, at 16–18).  According to Steven Ambriz, Axxiom's engineering supervisor, (Docket Entry No. 49, Ex. B, ¶ 2), earlier versions of this 1987 manual dated back to approximately 1980, (Docket Entry No. 94, Ex. B, at 27–28).  Only the 1987 manual, however, is in the record.  For this manual, Axxiom has conceded that Schmidt did not attach the required copyright notice under the then-applicable 1976 Copyright Act.  (Docket Entry No. 96, at 4); *see generally* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §§ 7.02[A]–[B] (2011).

Ten years later, in 1997, U.S. Filter published an Owner's Manual for its 1.5, 3.5, 6.5, 8, 10 & 20 Cu. Ft Abrasive Blasters.  (Docket Entry No. 56, Ex. A).  Although this manual differs from

---

[3]  Forecast has moved to strike the underlying declaration from which these facts are drawn.  (Docket Entry No. 67).  According to Forecast, the declarant, Phuong Taylor Nguyen, lacks personal knowledge of this chain of events leading from Schmidt to Axxiom.  (*Id.*, ¶ 7).  The objection is unpersuasive.  Nguyen states that he currently serves as Axxiom's Vice President and General Manager.  He began working for Schmidt in 1991, and then worked for "the intervening successor companies," and finally worked for Axxiom.  (Docket Entry No. 61, Ex. L, ¶ 1).  Nguyen has personal knowledge of the history of the companies with which he has been associated for over two decades, the current one of which he serves as an executive officer.  The declaration does not contain legal conclusions and, to the extent it does, they are disregarded.

In this same filing, Forecast also has moved to strike pages from what is identified as a 2004 Forecast manual on authentication grounds.  (Docket Entry No. 67, ¶ 9).  Axxiom responds that Forecast's president identified the pages as from Forecast's 2004 manual.  (Docket Entry No. 77, at 3–4).  This deposition testimony is in the summary-judgment record.  (Docket Entry No. 83, Ex. 2, at 93–97).  Forecast has moved to strike Axxiom's response as untimely.  (Docket Entry No. 78).  The court will construe Axxiom's response as a motion for leave to file an untimely response, and that motion is granted.  Each party has made numerous filings outside the motion, response, and reply, and the court will consider each filing.  Forecast's motion to strike, (Docket Entry No. 67), is denied.

its 1987 predecessor in some respects—there are numerous textual differences, for example[4]—the exploded-parts drawings and accompanying legends are extremely similar.  This is true for the Thompson Valve, Micro Valve, and Combo Valve.  The 1997 manual's component-part descriptions were, according to Ambriz, "pretty much the same" as the older manuals' descriptions.  (Docket Entry No. 94, Ex. B, at 30).  The valve drawings, on the other hand, were somewhat different. Unlike the 1987 manual's drawings, which were created by hand, the 1997 manual's drawings were created by computer.  (*Id.*, at 31).  Ambriz explained that U.S. Filter used the hand drawings in creating the computer drawings.  (*Id.*, at 40–42; *see also id.*, at 35–38 (discussing three methods of using the hand drawings to create the computer drawings, but admitting he was unsure which method was used)).  The 1997 exploded-parts computer drawing of the Thompson Valve, (Docket Entry No. 56, Ex. A, at 20), looks very similar to the 1987 hand drawing, (Docket Entry No. 94, Ex. A, at 17).  The same is true for the Micro Valve, (*compare* Docket Entry No. 56, Ex. A, at 14; *with* Docket Entry No. 94, Ex. A, at 16), and the Combo Valve (*compare* Docket Entry No. 56, Ex. A, at 15; *with* Docket Entry No. 94, Ex. A, at 18).

Axxiom, claiming a written transfer agreement from U.S. Filter, registered the copyright on the 1997 manual effective July 7, 2010.  The 1997 manual's listed date of first publication was December 31, 1997.  (Docket Entry No. 61, Ex. I).

After Axxiom took over the Schmidt product line, it published at least two additional manuals after the 1997 manual.  The first, published in 2004, also was an Owner's Manual for 1.5, 3.5, 6.5, 8, 10 & 20 Cu. Ft. Abrasive Blasters.  (Docket Entry No. 56, Ex. B).  The 1997 and 2004

---

[4] (*Compare* Docket Entry No. 56, Ex. A, at ii, 1–2; *with* Docket Entry No. 94, Ex. A, at 2–4).

manuals are similar.  The covers reflect the different companies[5]; one of the warnings is reworded[6]; and the 2004 manual contains a drawing for a new valve, the Thompson Valve II, that the 1997 manual lacks.[7]  But the pages on the Micro Valve, Combo Valve, and Thompson Valve are extremely similar.  The drawings appear to be identical, although there are slight variations in the descriptions.  (*Compare* Docket Entry No. 56, Ex. A, at 14–15, 20; *with* Docket Entry No. 56, Ex. B, at 14–15, 20).  Axxiom claims to be the author of the manual text and artwork.  It registered the copyright on the 2004 manual effective July 7, 2010.  The 2004 manual's listed date of first publication was December 31, 2004.  (Docket Entry No. 61, Ex. K).

Axxiom published another manual in 2008.  (Docket Entry No. 49, Ex. E).  This manual differs significantly from its predecessors.  It is 86 pages long; the 2004 manual, by contrast, is 26 pages.  The 2008 manual contains substantially more information than its predecessors, including a step-by-step assembly guide.  The drawings and descriptions of the Micro Valve, Combo Valve, and Thompson Valve are little changed from the 1997 and 2004 manuals.  (*Id.*, at 66, 68–69).  The 2008 manual's exploded-parts drawing of the Micro Valve, and accompanying text, appear to be identical to the 2004 manual's drawing.  (*Compare id.*, at 66; *with* Docket Entry No. 56, Ex. B, at 14).  The same is true for the 2008 manual's and 2004 manual's exploded-parts drawings for the Combo Valve, although the 2008 manual contains two additional pictures enlarging items 4 and 10.  (*Compare* Docket Entry No. 49, Ex. E, at 68; *with* Docket Entry No. 56, Ex. B, at 15).  And the same is true for the 2008 manual's and the 2004 manual's Thompson Valve, although the 2008 manual

---

[5]  (*Compare* Docket Entry No. 56, Ex. A; *with* Docket Entry No. 56, Ex. B).

[6]  (*Compare* Docket Entry No. 56, Ex. A, at ii (second warning); *with* Docket Entry No. 56, Ex. B, at ii (first warning)).

[7]  (Docket Entry No. 56, Ex. B, at 21).

rotates the assembled valve slightly in the drawing and points out the location of the valve's "Air Signal Port." (*Compare* Docket Entry No. 49, Ex. E, at 69; *with* Docket Entry No. 56, Ex. B, at 20).

Ambriz confirmed that the exploded-parts drawings of the Thompson Valve, Micro Valve, and Combo Valve in the 2008 and 2004 manuals are identical to the ones in the 1997 manual. (Docket Entry No. 94, Ex. B, at 53). Forecast's counsel asked Ambriz which pages in older Schmidt manuals Axxiom "incorporated" into its 1997 manual.[8] Ambriz responded: "The general design of the cover and the—the warning notes and the safe procedures." (Docket Entry No. 94, Ex. B, at 28). Forecast's counsel then attempted to go page-by-page through the 1997 manual and ask whether that page was incorporated from the 1980 manual. (*Id.*, at 28–29). Ambriz responded, "Well, just to keep it short, I would say that all these pages . . . . because you—you're carrying on and developing year after year." (*Id.*, at 29). In a postdeposition declaration submitted after Forecast's most recent motion for summary judgment, however, Ambriz denied that the exploded-parts drawings in the 1997, 2004, and 2008 manual were "based on the Schmidt Manufacturing Inc. 1987 manual or any other manual[.]" (Docket Entry No. 96, Ex. 1, ¶ 6).

### B.     Forecast

Forecast has been in the abrasive-blasting business for over 35 years. It designs, manufactures, and markets abrasive-blasting products under the name "Pirate Brand." Forecast admits that "[t]he origin of the name [] comes from the fact that we got our start by manufacturing aftermarket (commonly referred to as 'pirated') replacement parts as an alternative to other manufacturers['] OEM parts." (Docket Entry No. 83, Ex. 1, at 1). "OEM" is an acronym for

---

[8]  Although U.S. Filter created the 1997 manual—and Axxiom thereafter assumed the rights to it—for ease, the court refers to this manual simply as Axxiom's 1997 manual.

"[o]riginal equipment manufacturer." (Docket Entry No. 83, Ex. 3, at 34). In this case, OEM refers

to Schmidt brand products manufactured by Axxiom. (*Id.*, at 35).

In May 2009, Forecast published a User's Manual for its Pirate Brand 3.5 / 6.5 – SPH / SPR

Series Blasters. (Docket Entry No. 29, Ex. 2, at 1). The Pirate Brand valves correspond to the

Axxiom Schmidt valves. The Pirate Brand Combination Valve[9] corresponds to the Schmidt Combo

Valve.[10] (Docket Entry No. 83, Ex. 2, at 35). The Pirate Brand APV (Automatic Plunger Valve)[11]

corresponds to the Schmidt Thompson Valve.[12] (*Id.*, at 33). Forecast originally called this valve the

Thomas Valve but then changed the name to APV because the first name was "[p]otentially

misleading[.]" (*Id.*, at 33, 51). Finally, the Pirate Brand MPV (Manual Plunger Valve)[13]

corresponds to the Schmidt Micro Valve.[14] (*Id.*, at 35). Forecast originally called this valve the

Mikro Valve but then changed the name to MPV out of concern that the first name might be

misleading. (*Id.*, at 35, 50).

The Forecast manual pages for these three valves are similar to the corresponding Axxiom

manual pages. The Pirate Brand part numbers are identical to the Schmidt part numbers. The

exploded-parts drawings and descriptions are extremely similar. Sally Andis, Forecast's General

Manager, testified in her deposition that the artist responsible for creating the Pirate Brand drawings

---

[9]  (Docket Entry No. 29, Ex. 2, at 37).

[10]  (*E.g.*, Docket Entry No. 56, Ex. B, at 15).

[11]  (Docket Entry No. 29, Ex. 2, at 39).

[12]  (*E.g.*, Docket Entry No. 56, Ex. B, at 20).

[13]  (Docket Entry No. 29, Ex. 2, at 40).

[14]  (*E.g.*, Docket Entry No. 56, Ex. B, at 14).

looked at the Axxiom manuals.  (Docket Entry No. 101, Ex. C, at 41).  Andis emphasized, however, that the artist drew the Pirate Brand drawings by hand.  (*Id.*, at 41–42).

There are some differences between the pages containing the Axxiom drawings and the Pirate Brand drawings.  The Pirate Brand drawings are not at an angle and the component parts are shaded differently.  While the Axxiom manuals contain two-dimensional computer drawings of the assembled valves, the Forecast manual contains three-dimensional, realistic renderings of the assembled valves.  (*Compare* Docket Entry No. 29, Ex. 2, at 37, 39–40; *with, e.g.*, Docket Entry No. 56, Ex. B, at 14–15, 20).

Discovery revealed additional exploded-parts drawings of the Pirate Brand valves, then known under the general Forecast name.  These drawings of the Mikro Valve, Thomas Valve, and Combination Valve are dated July 6, 2004.  (Docket Entry No. 61, Exs. K-1, K-2, K-3).  Brian McCoy, Forecast's president, confirmed in his deposition that these drawings came from a Forecast "cut sheet."  McCoy explained that a cut sheet was a flier that distributors could print from Forecast's website and modify for sales purposes.  A plan to publish these cut sheets online "never came to fruition."  (Docket Entry No. 83, Ex. 2, at 94).  The exploded-parts drawings of the Forecast valves are seemingly identical to their counterpart drawings in the 2004 Axxiom manual.  (*Compare* Docket Entry No. 61, Exs. K-1, K-2, K-3; *with* Docket Entry No. 56, Ex. B, at 14–15, 20).  McCoy admitted that it appeared as if Forecast's artist had physically cut the drawings out of the Axxiom manual and pasted them into the Forecast cut sheets.  He did not know whether such cutting and pasting had actually occurred.  (Docket Entry No. 83, Ex. 2, at 95, 97).

One other Pirate Brand valve is at issue: the Pirate Brand APVII (Automatic Plunger Valve II).  (Docket Entry No. 29, Ex. 2, at 38).  McCoy denied that the Pirate Brand APVII corresponds

to the Schmidt Thompson II Valve.[15]  McCoy explained that the APVII performed better, and cost less, than the Thompson II Valve.  (Docket Entry No. 83, Ex. 2, at 68–69).  He also testified that the APVII and Thompson II Valve were not interchangeable.  (*Id.*, at 70).

Forecast's marketing materials state that Pirate Brand aftermarket replacement parts "are 100% compatible and equal or better in quality to the original part."  (Docket Entry No. 83, Ex. 1, at 2, 3).  Jim Burns, who works at Forecast as its assembly manager and as a returned-products examiner, (Docket Entry No. 83, Ex. 3, at 12), explained the basis for this statement.  He conducted tests to confirm the Pirate Brand parts' compatibility with Axxiom products.  (*Id.*, at 35, 44).  To test compatibility, he did an initial test of both the Schmidt valve and the Pirate Brand valve, then interchanged the two valves' parts to test for functionality, and then did another test.  (*Id.*, at 35–39).  For the Pirate Brand APV and Combination Valves, and their respective Schmidt Thompson and Combo Valves, initial testing meant pressure testing to see if the valve "opens and closes properly as it should" for "[s]mooth operation."  (*Id.*, at 36–39).  Burns did not write down the test results.  (*Id.*, at 37–38).  Instead, he conveyed the results verbally to McCoy.  (*Id.*, at 42).  For the Pirate Brand MPV Valve and its respective Schmidt Micro Valve, initial testing consisted simply of "[o]pening the valve all of the way and then closing it all of the way."  (*Id.*, at 41).  Burns did not weigh the valves to compare their weights, test to see whether the valves were made of the same materials, conduct destructive testing, or test flow capabilities.  (*Id.*, at 44).

Forecast's marketing materials also state that "[a]ll Pirate Brand aftermarket replacement parts meet or exceed OEM specifications."  (Docket Entry No. 83, Ex. 1, at 1).  When asked in his deposition about this statement, Burns deferred to McCoy.  (Docket Entry No. 83, Ex. 3, at 34).

---

[15]  (*E.g.*, Docket Entry No. 56, Ex. B, at 21).

McCoy acknowledged that Forecast made that statement.  (Docket Entry No. 83, Ex. 2, at 54–55). When asked what testing procedures were used to confirm this statement, McCoy responded that Forecast used the testing procedure that Burns described for testing the Pirate Brand valves' compatibility.  (*Id.*, at 57).

At some point, Axxiom began to investigate Forecast's actions in the marketplace.  Phuong Taylor Nguyen, Axxiom's executive vice president and general manager and an employee with Axxiom's predecessor companies dating back to 1991 with Schmidt, and William Patrick Nelson, Axxiom's vice-president of sales and an employee with Axxiom's predecessor companies dating back to 1989 with Schmidt, led the investigation.  Nguyen stated that "Axxiom has received complaints from customers who ordered valves by part numbers and contacted Axxiom when the valves failed.  Axxiom determined that the valves were manufactured by Forecast." (Docket Entry No. 83, Ex. 4, at 4).

Nelson did a more thorough investigation.  He learned that "customers have sought to purchase Schmidt brand valves manufactured by Axxiom, and ordered such valves by part number, and instead of receiving genuine Schmidt valves, were shipped Forecast substitute valves of the same part number without any notice of the substitution."  (Docket Entry No. 83, Ex. 8, at 1). Nelson had three people—a consumer of blasting products, a personal acquaintance, and an Axxiom employee—order Schmidt valves from Forecast distributors using Axxiom part numbers and forward the unopened boxes to him.  When Nelson opened the boxes and inspected the valves and component parts, he determined that he had not been shipped Axxiom products, but rather Forecast products.  (*Id.*, at 1–2).  Most of the purchase orders and packing slips indicated that what had been purchased and shipped were Axxiom products.  (*See* Docket Entry No. 83, Exs. 8-A, 8-B, 8-C, 8-D, 8-E, 8-H).  The remaining orders and slips merely described the generic product; no brand was

listed.  (*See* Docket Entry No. 83, Exs. 8-F, 8-G, 8-I, 8-J).

McCoy admitted in his deposition that Forecast used Axxiom's part numbers as the Pirate Brand part numbers for "a large number" of Pirate Brand valves.  (Docket Entry No. 83, Ex. 2, at 36).  When asked why, McCoy answered that the numbers "are the same or similar for the purpose of comparison."  (*Id.*, at 37).  He later said that having identical part numbers shows distributors that Pirate Brand component parts "[are] compatible with their [Axxiom's] part number."  (*Id.*, at 41). McCoy was asked how Forecast's affiliate company, which until 2006 sold Axxiom products, would respond when a customer called to order a valve but only gave the part number.  McCoy responded that "[i]n most cases we would offer them both.  We tell them we have the Pirate Brand or we have the OEM [Axxiom].  Which would you prefer?"  (*Id.*, at 43).  McCoy stated that he verbally instructed his salespersons to give this response.  (*Id.*, at 44).  McCoy was asked how Forecast's distributors would respond if faced with a similar question.  He responded that he did not know how they handled such questions, but explained that Forecast would send each distributor "a mandatory acknowledgment that they understand they are selling after-market products."  (*Id.*, at 48).

Nguyen also investigated Forecast's statements about the Forecast products' quality.  In October 2009, Nguyen instructed Burton Lacour, Axxiom's quality-control manager, to order a metallurgy analysis of the Schmidt Thompson Valve as compared to the Pirate Brand APV.  (Docket Entry No. 83, Ex. 4, at 1).  Lacour had Precision PMI do this analysis.  (Docket Entry No. 83, Ex. 5, at 1).  Precision PMI reported "that the quality of the tungsten carbide in the Forecast valve was of a lower quality than the tungsten carbide in the Axxiom products."  (*Id.*, at 2).  As a result, the Pirate Brand valve would show more wear, or deteriorate, more quickly than its Schmidt counterpart.  (*Id.*, at 2).  Lacour conducted life-cycle tests on the Schmidt Thompson and Thompson II Valves as compared to the Pirate Brand APVII.  (*Id.*; *see also* Docket Entry No. 83, Exs. 5-A–5-

11

Q).  His tests demonstrated that "the Forecast valve had excessive wear on the tungsten carbide components of the valve, high deformity of a seal, and binding of the moving components causing the valve not to open and close properly."  (Docket Entry No. 83, Ex. 5, at 2).  The Schmidt valves had no such performance issues.  (*Id.*).

Nguyen summarized the test results, as follows:

> [T]he tests performed show that Forecast valves are clearly neither equivalent to nor superior in design or materials.  The Forecast valve has a lower grade of tungsten carbide, has a more fragile sleeve design, requires a higher pressure to operate, has a design that leads to premature seat or seal failure, and has lower urethrane quality.

(Docket Entry No. 83, Ex. 4, at 4).  According to Nguyen, these qualities cut against the industry preference of purchasing "more durable valves that do not have to be replaced as often."  (*Id.*).  But because consumers have relied on Forecast's false representations that its Pirate Brand valves are equal to or better than Axxiom's Schmidt valves, Nguyen explains, Axxiom has lost business.  (*Id.*).  Despite these claims of inferior quality, Burns claimed that, since he began examining returned products, he has examined "maybe" five Pirate Brand valves that were returned.  His examinations revealed no defects.  (Docket Entry No. 83, Ex. 3, at 25–26).

In a December 11, 2006 letter to Forecast, an attorney for Axxiom stated in part:

> It has come to our attention that you, either personally or through your companies, are promoting and selling products that are not genuine products of Axxiom under one or more of these trademarks or in a manner that incorrectly implies to the purchaser that he is purchasing genuine Axxiom products.  We also understand that you, either personally or through your companies, are improperly using copyrighted Schmidt part descriptions and Schmidt part numbers in your product literature so as to potentially mislead customers.  We further understand that such activities may be carried out under the IDS Blast Finishing Name or the Forecast name and that these companies are both owned or controlled by you.

(Docket Entry No. 56, Ex. E, at 1).  The letter stated that these actions violated the Lanham Act.

12

(*Id.*).

Axxiom filed this lawsuit on November 17, 2009. (Docket Entry No. 1). Forecast moved to dismiss. (Docket Entry No. 5). This court granted the motion in part with leave to amend and converted in part to a motion for summary judgment. (Docket Entry No. 26). Axxiom amended its complaint. (Docket Entry No. 27). The parties' cross-motions for summary judgment and related filings followed.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

13

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on its pleading allegations.  The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).  When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."  *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (internal quotation marks and alteration omitted).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  FED. R. CIV. P. 56(e)(2).

## III.    Analysis

Both Axxiom and Forecast seek summary judgment on Axxiom's copyright-infringement claims.  Forecast also seeks summary judgment on Axxiom's Lanham Act and state-law claims.  The motions are analyzed below.

### A.    Copyright Infringement

#### 1.    The Applicable Law

"Civil actions under the Copyright Act must be brought 'within three years after the claim has accrued.'"  *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (quoting 17 U.S.C. § 507(b)); *accord, e.g.*, *Jaso v. The Coca Cola Co.*, 435 F. App'x 346, 352 (5th Cir. 2011) (per curiam).  In the

14

Fifth Circuit, "a copyright claim accrues 'when [the party] knew or had reason to know of the injury upon which the claim is based.'" *Jordan v. Sony BMG Music Entm't Inc.*, 354 F. App'x 942, 945 (5th Cir. 2009) (per curiam) (quoting *Pritchett v. Pound*, 473 F.3d 217, 220 (5th Cir. 2006)).

If the claim is timely, "[t]o prove copyright infringement, a plaintiff must establish (1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam). "Copyright ownership is shown by (1) proof of originality and copyrightability and (2) compliance with the applicable statutory requirements." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 408 (5th Cir. 2004). The Copyright Act presumes the validity of copyrights registered within five years of the work's first publication. 17 U.S.C. § 410(c). For copyrights registered outside of that five-year period, "[t]he evidentiary weight to be accorded the certificate of registration . . . shall be within the discretion of the court." *Id.* "[C]ertificates create only a rebuttable presumption that the copyrights are valid." *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995); *accord, e.g.*, *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).

"A notice requirement has formed a part of every U.S. copyright statute since the original act of 1790." 2 NIMMER ON COPYRIGHT § 7.02[A]. The requirement "has been relaxed over time, however, and it is important to determine the date a work was first generally published in order to ascertain the precise consequences of the publication." ROGER E. SCHECHTER & JOHN R. THOMAS, INTELLECTUAL PROPERTY: THE LAW OF COPYRIGHTS, PATENTS AND TRADEMARKS § 5.2 (2003). Professor Nimmer organizes works into three categories: 1909 Act publications, decennial publications, and Berne Era publications. 2 NIMMER ON COPYRIGHT § 7.02[C].

1909 Act publications include works published before January 1, 1978, when the 1909 Copyright Act governed. *Id.* § 7.02[C][1]. "[T]he general rule under the 1909 Copyright Act is that

15

a work published in the United States without the statutorily required copyright notice fell into the public domain, 'precluding forever any subsequent copyright protection of the published work.'" *Warner Bros. Entm't, Inc. v. X One X Productions*, 644 F.3d 584, 593 (8th Cir. 2011) (quoting *Twin Books Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1165–66 (9th Cir. 1996)).

Decennial publications include works published between January 1, 1978, the effective date of the 1976 Copyright Act, and March 1, 1989, the effective date of the Berne Convention in the United States.  2 NIMMER ON COPYRIGHT 7.02[C][2]. Works published in this decennial era without the then-applicable statutorily required copyright notice, *see* Pub. L. No. 94-553, § 401 (1976) (codified as amended at 17 U.S.C. § 401 (1978)), also fall into the public domain, *see Norma Ribbon & Trimming*, 51 F.3d at 48; *Bell v. E. Davis Int'l, Inc.*, 197 F. Supp. 2d 449, 460–61 (W.D.N.C. 2002) (also describing methods by which claimed copyright holder can cure lack of notice).

Finally, Berne Era publications include works published after March 1, 1989, the Berne Convention's effective date.  2 NIMMER ON COPYRIGHT § 7.02[C][3].  For these works, "notice is no longer required at publication."  *Maverick Recording Co. v. Harper*, 598 F.3d 193, 199 (5th Cir. 2010) (quoting 2 NIMMER ON COPYRIGHT § 7.02[C][3]).  As the *Maverick Recording* court summarized, "[b]efore the Berne Convention was adopted, publishers ran the risk of placing their work into the public domain by failing to include a notice of copyright."  598 F.3d at 199.

"The significance of the copyright sequence, combined with the principle that no individual may copyright a work in the public domain, is that ordinarily works in the public domain stay there." *Golan v. Gonzales*, 501 F.3d 1179, 1189 (10th Cir. 2007).  Nevertheless, "a work may be protected by copyright even though it is based on a prior copyrighted work or something already in the public domain if the author, through his skill and effort, has contributed a distinguishable variation from the older works."  *Donald v. Zack Meyer's T. V. Sales & Serv.*, 426 F.2d 1027, 1029 (5th Cir. 1970).

That is because copyright law protects "derivative works."  The Copyright Act defines a derivative work as:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.  A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101.  As indicated in *Donald*, this definition encompasses "a new version of a work in the public domain[.]"  1 NIMMER ON COPYRIGHT § 3.03[A].

The Seventh Circuit has set out two principles helpful in judging derivative works: "(1) the originality requirements for derivative works is not more demanding than the originality requirement for other works; and (2) the key inquiry is whether there is sufficient nontrivial expressive variation in the derivative work to make it distinguishable in some meaningful way."  *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 521 (7th Cir. 2009); *see also Mass. Museum of Contemporary Art Found., Inc. v. Büchel*, 593 F.3d 38, 64–65 (1st Cir. 2010) (explaining that, to qualify as a derivative work, "the variation from the original must be 'sufficient to render the derivative work distinguishable from its prior work in any meaningful manner'" (quoting 1 NIMMER ON COPYRIGHT § 3.03[A])).

As to the first principle, "[i]n order to be copyrightable, a work must contain a certain modicum of originality.  Originality's relatively low hurdle may be cleared when the 'selection and arrangement' of sometimes uncopyrightable facts evinces a 'minimal degree of creativity.'"  *Compaq Computer*, 387 F.3d at 410 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)).  As one court stated:

> The Copyright Office established a regulation providing examples of the types of works that fall into the category of works that lack a minimum level of creativity and do not and do not qualify for copyright protection, including "[w]ords and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring; mere listing of ingredients or contents."  37 C.F.R. § 202.1(a).

*Darden v. Peters*, 488 F.3d 277, 286 (4th Cir. 2007).  This regulation, though lacking the force of law, "is a fair summary of the law."  *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1520 n.21 (1st Cir. 1996) (quoting *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir. 1959)); *see also, e.g.*, *Taylor v. IBM*, No. 02-10391, 2002 WL 31845220, at *1 (5th Cir. Dec. 10, 2002) (per curiam) (citing regulation to hold that a work is not copyrightable).

The second principle—the requirement that the derivative work be sufficiently distinguishable from the original work—is more demanding.  The variation must be more than "merely trivial."  1 NIMMER ON COPYRIGHT § 3.03[A].  For example, "[c]hanging the medium in which a copyrightable work is displayed is not a sufficient change to give rise to a derivative work." *CRC Press LLC v. Wolfram Research Inc.*, 149 F. Supp. 2d 500, 509 (C.D. Ill. 2000); *accord L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d Cir. 1976) (en banc) ("to support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium").[16]  The Copyright Office's regulation listing items that lack a minimum level of creativity applies equally to derivative works and the accompanying requirement

---

[16] *See also Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 196 (S.D.N.Y. 1999) ("The requisite 'distinguishable variation,' moreover, is not supplied by a change of medium, as 'production of a work of art in a different medium cannot by itself constitute the originality required for copyright protection.'" (quoting *Past Pluto Productions v. Dana*, 627 F. Supp. 1435, 1441 (S.D.N.Y. 1986)); *Modern Publ'g v. Landoll, Inc.*, 849 F. Supp. 22, 24 (S.D.N.Y. 1994) ("in copyright law the medium is not the message, and a change in medium does not preclude infringement" (internal alteration and quotation marks omitted)); *Moore Publ'g, Inc. v. Big Sky Mktg., Inc.*, 756 F. Supp. 1371, 1376 (D. Idaho 1990) ("changing the medium of an item from metal to plastic" does not "constitute[] more than a trivial contribution for copyright purposes"); *Sargent v. Am. Greetings Corp.*, 588 F. Supp. 912, 919 (N.D. Ohio 1984) ("changes from a preexisting work inherent to construction in a new medium, i.e. changes that are not attributable to independent artistic skill and endeavor, are trivial variations and are not copyrightable").

that the variation from the underlying work be nontrivial.  *See Darden*, 488 F.3d at 286–87 (person's contributions to previous works "resemble the list of examples of uncopyrightable works set forth in 37 C.F.R. § 202.1(a)").

A derivative work's copyright "is thin, extending only to the incremental original expression contributed by the author of the derivative work." *Schrock*, 586 F.3d at 521; *accord, e.g.*, *Waldman Pub'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994) ("In the case of a derivative work based on an underlying work that is in the public domain, only the material added to the underlying work is protected by copyright." (citing 1 NIMMER ON COPYRIGHT § 3.07[C])).  This principle comes directly from the Copyright Act: "The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work[.]"  17 U.S.C. § 103(b).

### 2.    Limitations

Forecast argues at the outset that two of Axxiom's copyright-infringement claims are time-barred.  (Docket Entry No. 56, ¶ 41).  Forecast has submitted a letter dated December 11, 2006 from an Axxiom attorney stating that Axxiom was aware that Forecast is "improperly using copyrighted Schmidt part descriptions and Schmidt part numbers in your product literature so as to potentially mislead customers."  (Docket Entry No. 56, Ex. E, at 1).  Axxiom filed suit in this court on November 17, 2009.  (Docket Entry No. 1).  In its original complaint, Axxiom asserted only one copyright-infringement claim, based on the alleged infringement of the 2008 manual.  (*Id.*, ¶¶ 10, 13).  The amended complaint, filed on July 9, 2010, added two new copyright-infringement claims: one for the 1997 manual, and one for the 2004 manual.  (Docket Entry No. 27, ¶¶ 23–28).  Because these claims were not added until more than three years after Axxiom's December 2006 letter identifying the potential copyright injury, Forecast concludes that Axxiom's copyright-infringement

19

claims based on the 1997 and 2004 manuals are time-barred.  (Docket Entry No. 56, ¶ 41).  Axxiom responds that the letter discusses only trademark infringement, not copyright infringement and that, in any event, the new claims relate back to the original complaint under Federal Rule of Civil Procedure 15(c).  (Docket Entry No. 61, at 19).

Axxiom's contention that its December 2006 letter does not discuss copyright infringement is unpersuasive.  In the Fifth Circuit, "a copyright claim accrues 'when [the party] knew or had reason to know of the injury upon which the claim is based.'"  *Jordan*, 354 F. App'x at 945 (quoting *Pritchett*, 473 F.3d at 220).  The letter expressly sets forth Axxiom's belief that Forecast is improperly using an Axxiom copyright.  Although the letter specifically cites only the Lanham Act in referring to statutory violations, it shows that Axxiom had reason to know that Forecast might be infringing on any copyright Axxiom had in the manuals.  At the latest, Axxiom's copyright-infringement claim accrued when its attorney mailed the cease-and-desist letter.

On the other hand, Axxiom is correct that its copyright-infringement claims based on the 1997 and 2004 manuals relate back to its original complaint.  "An amended complaint may 'relate back' to an original complaint for statute of limitations purposes."  *Sanders-Burns v. City of Plano*, 594 F.3d 366, 372 (5th Cir. 2010).  Federal Rule of Civil Procedure 15(c) states in relevant part that "[a]n amendment to a pleading dates back to the date of the original pleading when . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]"  FED. R. CIV. P. 15(c)(1).  Axxiom's original complaint, as the basis of its copyright-infringement claims, alleged that Forecast's manual copied directly from Axxiom's copyrighted 2008 manual.  (*See* Docket Entry No. 1, ¶¶ 24–25).  Axxiom's amended complaint, as the basis of its additional claims, alleged that the same Forecast manual copied directly not only from Axxiom's 2008 copyrighted manual, but also from its 1997

20

and 2004 copyrighted manuals.  (*See* Docket Entry No. 27, ¶¶ 20–28).  These new claims arise out of the same alleged conduct: Forecast's copying of Axxiom's copyrighted materials.  Axxiom's additional copyright-infringement claims are not time-barred.

### 3.    Valid Copyrights

To succeed on its claims, Axxiom must first establish that it owns valid copyrights in the three manuals.  *See Armour*, 512 F.3d at 152.  Axxiom relies heavily on the Copyright Act's presumption of validity.  Because the 2008 manual is the only one of the three registered with the Copyright Office within five years of its first publication, it is the only manual entitled to the statutory presumption of validity.  *See* 17 U.S.C. § 410(c).  Even if all three manuals carried the presumption, however, it is rebuttable.  *See Norma Ribbon & Trimming*, 51 F.3d at 47.

An initial question is whether Axxiom could copyright its manuals.  If the answer is yes, another question arises: whether Axxiom could copyright the drawings within its manuals.  Copyright law protects a "compilation," *see* 18 U.S.C. § 103, defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship," *id.* § 101.  In *Feist*, the Supreme Court explained that

> [f]actual compilations . . . may possess the requisite originality.  The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they are used effectively by readers.  These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws.

499 U.S. at 347.  "Most compilations, merely by exercising some independent choice in the coordination, selection, or arrangement of data, will pass the test."  *CCC Info. Servs., Inc. v.*

*Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 65 (2d Cir. 1994) (interpreting *Feist*).

Courts have found manuals organizing factual information in a useful manner to be copyrightable compilations. *See B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1007 (D. Ariz. 2011) (employee training manual); *Portionpac Chem. Corp. v. Sanitech Sys.*, 217 F. Supp. 2d 1237, 1246 (M.D. Fla. 2002) (reference manual); *Greaver v. Nat'l Ass'n of Corporate Directors*, No. C. A. 94-2127 (WBB), 1997 WL 34605245, at *3–4 (D.D.C. Nov. 19, 1997) (seminar manual); *see also Eagle Servs. Corp. v. H20 Indus. Servs., Inc.*, 532 F.3d 620, 622–23 (7th Cir. 2008) (Posner, J.) (assuming that a safety manual is a copyrightable compilation). The owner's manuals in this case pass *Feist*'s minimal threshold for originality so as to be copyrightable as compilations. Although the manuals contain only factual information, the way in which Axxiom (and its predecessor companies, Schmidt and U.S. Filter) chose to arrange the information and drawings to assist product users entails the "minimal degree of creativity" required for a copyrightable compilation. *Feist*, 499 U.S. at 347.

The next question is whether the exploded-parts drawings are themselves copyrightable. Forecast relies on the merger doctrine to argue that they are not.[17]  (Docket Entry No. 56, ¶¶ 35–38). "If an idea is susceptible to only one form of expression, the merger doctrine applies and § 102(b) excludes the expression from the Copyright Act." *Veeck v. S. Bldg. Code Congress Int'l, Inc.*, 293 F.3d 791, 801 (5th Cir. 2002) (en banc). This doctrine applies "when there is only one feasible way of expressing an idea[.]" *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 497 (7th Cir. 2011); *accord, e.g.*, *Naghi v. Europe's Finest, Inc.*, 114 F. App'x 606, 607 (5th Cir. 2004) (per curiam) ("The merger

---

[17]  The court also notes Forecast's argument that because Axxiom's alleged copyright is in the manual, not the drawings themselves on which the infringement claims rest, Axxiom's claims must fail.  (Docket Entry No. 56, ¶ 11).  The argument lacks merit.  A copyrightholder does not need to register each page within a work as copyrighted to ensure each page's copyright; copyrighting the work as a whole suffices.  The issue, instead, is whether the specific part of the work alleged to have been infringed—in this case, the exploded-parts drawings—are properly copyrightable.

doctrine provides that if an idea is capable of only one manner of expression, the idea and the expression 'merge' and are exempted from copyright protection."). Forecast contends that the merger doctrine applies because there is only one way to draw the valves. (*See* Docket Entry No. 56, ¶¶ 36–37). Ambriz testified, however, that the way in which the valves were drawn is "up to the discretion of the artist as he determines will be best suited for the circumstances." (Docket Entry No. 49, Ex. B, ¶ 8). Axxiom has introduced the exploded-parts drawings of another company that, like Forecast, designs, manufactures, and markets aftermarket replacement parts for Axxiom products. This company's versions of the Micro and Thompson Valves are drawn differently from Axxiom's drawings. (*See* Docket Entry No. 49, Exs. B-1, B-5). Because more than one way exists in which to create an exploded-parts drawing of the Schmidt valves (or an aftermarket version of the valves), the merger doctrine does not apply. *Cf. Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1464 (5th Cir. 1990) (applying merger doctrine to drawing of maps where the company's "principal planning engineer testified that he could think of no other way to portray the idea of the pipeline's proposed location"). Axxiom's exploded-parts drawings are copyrightable. *See Goss Int'l Americas, Inc. v. A-American Mach. & Assembly Co.*, No. 07 C 3248, 2007 WL 4294744, at *2 (N.D. Ill. Nov. 30, 2007) (holding that exploded-parts drawing of printing-press parts is copyrightable).

The main issue raised in this case is not whether the Axxiom manuals and drawings are copyrightable in the abstract, but whether Axxiom could properly copyright them when, as Forecast argues, they previously had fallen into the public domain. Forecast has introduced a belatedly produced 1987 Schmidt manual that served as the predecessor to Axxiom's 1997 manual, and in turn its 2004 manual, and in turn its 2008 manual. The 1987 manual is a "decennial publication." Schmidt was required to attach notice of the copyright for it to be valid. *See* 2 Nimmer on

COPYRIGHT § 7.02[C][2].  Axxiom has conceded that Schmidt, its predecessor company, failed to attach such notice.  (Docket Entry No. 96, at 4).  Schmidt's failure to comply with the then-applicable notice requirement results in the 1987 manual, and all of the drawings and accompanying legends contained within the manual, falling into the public domain.[18]  *See Norma Ribbon & Trimming*, 51 F.3d at 47.

Axxiom makes two arguments that its copyright is valid.  First, Axxiom argues that Ambriz, its engineering supervisor, stated in a declaration that the 1997 manual's drawings "were independently created" and "were not based on the Schmidt Manufacturing Inc. 1987 manual or any other manual." (Docket Entry No. 96, Ex.1, ¶ 6).  Second, Axxiom argues that Forecast copied from the 1997 manual, not the 1987 manual.  (Docket Entry No. 96, at 4–5).  As to Ambriz's declaration, Forecast responds that it is a "sham affidavit" and, as such, should be disregarded.  (Docket Entry No. 101, ¶ 7 n.16).  The court agrees.

This circuit recognizes the sham-affidavit rule.  *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).[19]  "This authority stands for the proposition that a nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment."  *Id.*  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting the affidavit contradicting his own prior testimony, this would greatly

---

[18]  Under the 1976 Copyright Act, a copyrightholder's failure to attach the required notice "could be cured by subsequent reasonable efforts to affix notice and registration within five years."  2 NIMMER ON COPYRIGHT § 7.02[C][2].  Axxiom has not argued, however, that Schmidt took action to cure its failure.

[19]  Almost every circuit recognizes the sham-affidavit rule.  *See McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 750–51 (7th Cir. 2010); *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268–69 (3d Cir. 2010); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010); *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1382 (Fed. Cir. 2010); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010); *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009); *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009); *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007); *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 475–76 (8th Cir. 2006); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975–96 (4th Cir. 1990).

diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.*

(quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). As a recent

case explains:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. . . . [I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

*EBC*, 618 F.3d at 269 (quoting *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir

2007)).

An affidavit or declaration that contradicts prior deposition testimony should not

automatically be disregarded. Rather, the court should consider "if sufficiently persuasive reasons

are given [for the change in testimony], if the proposed amendments truly reflect the original

deponent's original testimony, or if other circumstances satisfy the court that amendment should be

permitted." *EBC*, 618 F.3d at 270; *see also, e.g.*, *Latimer*, 601 F.3d at 1237 (explaining that the

sham-affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case,"

but that courts nevertheless may apply it when there is "some inherent inconsistency between an

affidavit and a deposition" (internal quotation marks omitted)).

Forecast's counsel asked Ambriz in his deposition "what parts of the 1980 manual"—a

predecessor version of the 1987 Schmidt manual not in evidence—"were incorporated into this 1997

manual[.]" Ambriz responded: "The general design of the cover and the—the warning notes and

the safe procedures." (Docket Entry No. 94, Ex. B, at 28). Forecast's counsel then attempted to go

page-by-page through the 1997 manual to ask whether each page was incorporated from the 1980 manual.  (*Id.*, at 28–29).  Ambriz responded, "Well, just to keep it short, I would say that *all these pages* . . . . because you—you're carrying on and developing year after year."  (*Id.*, at 29 (emphasis added)).  Ambriz admitted that the component-part descriptions accompanying the exploded-parts drawings in the older manuals were "pretty much the same" as the drawings in the 1997 manual.  (*Id.*, at 30).  And Ambriz admitted that the computer drawings of the Micro, Combo, and Thompson Valves all "came from hand drawings that were digitally produced[.]"  (*Id.*, at 40–41).  He clearly testified that the computer drawings of these valves all came from the hand drawings of those valves in the 1980s manuals.  (*Id.*, at 42–43).  Despite this detailed deposition testimony, Ambriz's declaration—dated *after* Forecast's most recent motion for summary judgment—states that "[t]hese drawings were not based on the Schmidt Manufacturing Inc. 1987 manual or any other manual, but they were independently created."  (Docket Entry No. 96, Ex. 1, ¶ 6).

The inconsistency between Ambriz's deposition testimony and subsequent declaration is clear.  In admitting that the 1997 manual's computer drawings of the valves came from the 1980s manuals' hand drawings of these valves, Ambriz effectively stated that the 1997 drawings were "based on" the earlier drawings.  The court, taking the facts in the light most favorable to Axxiom, agrees with Axxiom that it expended independent effort to convert the hand drawings in the 1987 manual to computer drawings in the 1997 manual.  Forecast does not dispute this.  But, as Ambriz's testimony recognizes, the computer drawings were "based on" the earlier hand drawings.  Just as Axxiom vigorously has argued that Forecast must have copied from Axxiom's manuals given that the spacing between the component parts in the Forecast manual is identical to that in the Axxiom manuals, the same is true for Axxiom's 1987 and 1997 manuals.  (*Compare, e.g.*, Docket Entry No. 94, Ex. 1, at 16; *with* Docket Entry No. 56, Ex. A, at 14).  That the 1997 manual would employ the

identical spacing, and nearly identical angles, in displaying the component parts as the 1987 manual is not a coincidence.  And Ambriz's deposition testimony confirms that the 1997 drawings were based on the 1987 drawings.

Axxiom has provided no explanation for the contradiction between Ambriz's deposition testimony and his post-summary-judgment declaration.  Based on Ambriz's detailed deposition testimony and a comparison of the two manuals, no reasonable factfinder could find that the drawings in the 1997 manual—and, as a result, the drawings in the 2004 and 2008 manuals—were not "based on" the drawings in the 1987 manual.  To the extent Ambriz's declaration asserts that the 1997 drawings were not based on the 1987 drawings, such assertions cannot create a fact issue sufficient to defeat summary judgment.  These assertions are disregarded.  But to the extent that Ambriz's declaration points out how the drawings in the 1987 manual differ from the drawings in the 1997, 2004, and 2008 manuals, the court will consider those statements.  (*See* Docket Entry No. 96, Ex. 1, ¶¶ 7, 9, 11).

Axxiom's alternative argument against summary judgment is that the evidence shows that Forecast copied from the 1997, 2004, and 2008 manuals, which Ambriz admitted contained the same computer drawings of the valves in his deposition, (*see* Docket Entry No. 94, Ex. B, at 40–43; Docket Entry No. 96, Ex. 1, ¶¶ 8, 10, 12 (referring to "Axxiom's 1997–2008 copyrighted" drawings)), and not the 1987 manual.  Taking all the inferences in the light most favorable to Axxiom, this court agrees.  Whether Forecast copied from the 1997, 2004, or 2008 manual, as opposed to the 1987 manual, however, is irrelevant to whether Axxiom owns a valid copyright for the 1997, 2004, and 2008 manuals and specifically whether the copyright protection extends to the drawings on which Axxiom's copyright-infringement claims rest.

As previously discussed, Schmidt failed to attach the then-required copyright notice to its

27

1987 manual.  That failure resulted in the 1987 manual, and all of the drawings that appeared within it, falling into the public domain.  The evidence in the record—specifically, Ambriz's deposition testimony—conclusively demonstrates that Axxiom based its 1997 manual on Schmidt's 1987 manual, that Axxiom based its 2004 manual on its 1997 manual, and that Axxiom based its 2008 manual on its 2004 manual.  (Docket Entry No. 94, Ex. B, at 28–30, 40–43).  As Ambriz testified, each manual builds on the last one.  (*Id.*, at 29).

That the Axxiom 1997, 2004, and 2008 manuals were based on the 1987 public-domain manual, however, does not mean that Axxiom could not copyright the later manuals.  The definition of a derivative work encompasses "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship[.]" 17 U.S.C. § 101.  The 1997 manual revises and elaborates on the 1987 manual, as does the 2004 manual when compared to the 1997 manual, and as does the 2008 when compared to the 2004 manual.  The manner in which Axxiom expresses the facts contained within each manual, whether in pictorial, textual, or organizational form, "evinces a 'minimal degree of creativity.'"  *Compaq Computer*, 387 F.3d at 410 (quoting *Feist*, 499 U.S. at 345).  Each manual qualifies as a copyrightable derivative work of the 1987 public-domain manual.  But a derivative work's copyright "extend[s] only to the incremental original expression contributed by the author of the derivative work."  *Schrock*, 586 F.3d at 521; *see also* 17 U.S.C. § 103(b).

Because Axxiom alleges that Forecast infringed its copyright when Forecast copied the drawings of the Micro, Combo, and Thompson valves, "the key inquiry is whether there is sufficient nontrivial expressive variation in the derivative work"—in this case, the Axxiom manuals' exploded-parts drawings—"to make it distinguishable in some meaningful way."  *Schrock*, 586 F.3d at 521.  Axxiom argues that its drawings meet this standard in several ways.  First, Axxiom

28

repeatedly points out that its drawings are created by computer, while the 1987 manual drawings were created by hand.  As summarized above, the case law holds that simply changing the medium of expression constitutes a trivial variation.  *See, e.g.*, *CRC Press*, 149 F. Supp. 2d at 509.  Even assuming, as the court does at this summary-judgment stage, that Axxiom (or its predecessor U.S. Filter) expended substantial effort in translating the hand drawings to digital form in its 1997 manual, that effort is not meaningfully different from the effort it takes to convert expression from metal to plastic, *see Batlin*, 536 F.2d at 491–92, expression in a painting to a color transparency, *see Bridgeman Art Library*, 36 F. Supp. 2d at 196–97, or text in an encyclopedia to text on a website using HTML programming, *see CRC Press*, 149 F. Supp. 2d at 509–10.  Although converting the hand drawings to computer drawings may have "required both skill and effort, there was no spark of orginality[.]"  *Bridgeman Art Library*, 36 F. Supp. 2d at 197.  Axxiom's conversion to digital format constitutes a trivial variation.

Alternatively, Axxiom directs the court to numerous minor differences between the 1987 drawings and the 1997, 2004, and 2008 drawings.  Ambriz individually describes each difference in his most recent declaration.  (Docket Entry No. 96, Ex. 1, ¶¶ 7, 9, 11).  Some of these differences are differences in shading, which are trivial variations.  *See Darden*, 488 F.3d at  287 (referencing 37 C.F.R. § 202.1(a)).  Others are differences in the numbers used to identify the component parts, similar to "mere variations . . . of lettering" and trivial.  37 C.F.R. § 202.1(a).

Above all, Axxiom points to design differences between the 1987 manual's drawings and the 1997, 2004, 2008 manuals' drawings.  A few examples suffice: the "[k]nob shape is different," (Docket Entry No. 96, Ex. 1, ¶ 7(2)); "[t]he alignment angles of the exploded views are different," (*id.*, ¶ 7(11)); the "[u]pper rod guide cut-out positions are different by 45°," (*id.*, ¶ 9(4)); the "[c]ross section view hatching is different in angle and spacing," (*id.*, ¶ 9(11)); "[t]he shapes of the knob

finger grooves are different," (*id.*, ¶ 11(3)); and "[t]he gasket in the 1987 work shows an edge profile, while the 1997/2004/2008 works do not," (*id.*, ¶ 11(7)).  The alleged copyrightholder in *Batlin* made a similar argument about design differences in a case involving the copyrightability of a plastic "Uncle Sam" bank.  A metal version of the Uncle Sam bank, created originally by neither party to the suit, had long been in the public domain.  Jeffrey Snyder produced a plastic version based on the public-domain metal version.  He then registered a copyright for his plastic Uncle Sam bank.  When L. Batlin and Son discovered Snyder's plastic bank, it produced an identical plastic Uncle Sam bank based on the metal version.  Batlin sued for a preliminary injunction invalidating Snyder's copyright.  536 F.2d at 488.  The district court granted the injunction, and the Second Circuit—sitting en banc—agreed that the copyright was invalid because the differences between the plastic bank and the public-domain bank were trivial.

Before the Second Circuit, Snyder pointed out the differences between his plastic bank and the public-domain metal bank:

> Appellant Snyder claims differences not only of size but also in a number of other very minute details: the carpetbag shape of the plastic bank is smooth, the iron bank rough; the metal bank bag is fatter at its base; the eagle on the front of the platform in the metal bank is holding arrows in his talons while in the plastic bank he clutches leaves, this change concededly having been made, however, because "the arrows did not reproduce well in plastic on a smaller size."  The shape of Uncle Sam's face is supposedly different, as is the shape and texture of the hats, according to the Snyder affidavit.  In the metal version the umbrella is hanging loose while in the plastic item it is included in the single mold.  The texture of the clothing, the hairline, shape of the bow ties and of the shirt collar and left arm as well as the flag carrying the name on the base of the statue are all claimed to be different, along with the shape and texture of the eagles on the side.

*Id.* at 489.  Despite these numerous differences, the Second Circuit concluded that they were insufficient to confer derivative-work status.  "Many of these differences are not perceptible to the

30

casual observer." *Id.*  The court agreed with the district court that "the variations found in appellants' plastic bank were merely 'trivial' and that it was a reproduction of the metal bank made as simply as possible for the purposes of manufacture." *Id.*

As in *Batlin*, Axxiom has pointed out differences of a "very minute" level. *Id.*  Although the design changes are not necessarily due to the conversion from hand drawings to computer drawings, that does not make these changes any less trivial.  The casual observer would not be able to see the vast majority of the differences Axxiom identifies.

Taken as a whole, the modifications to the exploded-parts drawings of the Micro, Combo, and Thompson valves in the 1997, 2004, and 2008 manuals lack the "minimal degree of creativity" when compared to their counterparts in the 1987 manual, all of which are in the public domain. *Feist*, 499 U.S. at 345.  To the extent that Axxiom owns valid copyrights in the 1997, 2004, and 2008 manuals, that protection does not extend to those drawings. *See* 17 U.S.C. § 103(b); *Schrock*, 586 F.3d at 521.  And because Axxiom's copyright-infringement claims rest on copyright protection extending to these drawings, Axxiom's claims must fail.  Forecast is entitled to partial summary judgment on the copyright-infringement claims.

### B.    The Remaining Claims

Forecast has moved for partial summary judgment on Axxiom's Lanham Act and state-law claims.  "[I]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 (5th Cir. 2000) (internal quotation marks and alteration omitted); *accord Celotex*, 477 U.S. at 328 (White, J., concurring) ("It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.").  It equally "is not sufficient to merely list the elements of the claim and state that there is

no evidence to support the elements." *Seastrunk v. Darwell Integrated Tech., Inc.*, Civ. A. No. 3:05-CV-0531-BF ECF, 2008 WL 190316, at *3 (N.D. Tex. Jan. 22, 2008).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (internal quotation marks omitted).

Forecast has failed to meet its initial burden for summary judgment.  In seeking partial summary judgment on Axxiom's remaining claims, Forecast's discussion for each claim is limited to one paragraph.  Each paragraph lists the elements of the claim.  Forecast then concludes the paragraph with this one sentence, or a variation of this sentence, of argument: "Because Plaintiff cannot show evidence to support all, or alternatively any of the essential elements of this claim, summary judgment is proper."  (Docket Entry No. 62, ¶¶ 3, 6, 7; *see also id.*, ¶¶ 4 ("Summary Judgment is proper because Plaintiff cannot show evidence to support all, or alternatively any of these essential elements"), 5 ("However, as plaintiff cannot establish evidence to support all, or alternatively any of the essential elements for unjust enrichment summary judgment is proper.")).  These conclusory sentences, unsupported by any reference to the record (or specifically what the record lacks), cannot discharge Forecast's initial burden in seeking summary judgment.[20]  *See* FED. R. CIV. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  Forecast's motion for summary judgment on the Lanham Act and state-law claims is denied.

---

[20]  Because of Forecast's failure to meet its initial burden, it is unnecessary to analyze Axxiom's response to the motion.  (Docket Entry No. 83.)  But Axxiom's response is supported by competent evidence that, because of the lack of opposing evidence, would make summary judgment improper on the current record, at least as to the Lanham Act claim.

### IV.    The Motion for Leave to Designate Responsible Third Parties

On December 22, 2011, Forecast moved for leave to designate responsible third parties under TEX. CIV. PRAC. & REM. CODE § 33.004.  (Docket Entry No. 95).  Forecast argues that Axxiom repeatedly has refused to disclose the names of the distributors that Axxiom alleges shipped Forecast products in response to orders for Axxiom products, contrary to this court's instruction to disclose.  (*Id.*, ¶ 2).  Forecast explains that it recently learned the names of two distributors—T-Tex Equipment, Inc. and Midwest Surface Prep, LLC—based on Axxiom's latest disclosures.  According to Forecast, designation of these distributors as responsible third parties is necessary because they, not Forecast, may have been responsible for this conduct that damaged Axxiom.  (*Id.*, ¶ 4).  Axxiom has not responded.

Section 33.004 provides in part:

> (a) A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party.  The motion must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date.
>
> . . . .
>
> (f) A court *shall* grant leave to designate the named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served.

TEX. CIV. PRAC. & REM. CODE § 33.004 (emphasis added).  Axxiom's failure to object requires the court to grant the motion.  *Id.* § 33.004(f).  But this statute only applies to claims brought under Texas law; it does not apply to federal-law claims, such as the remaining Lanham Act claim in this case.  The motion is granted only as to the state-law claims.[21]

---

[21]   The court notes that Axxiom may later move to strike this designation.  TEX. CIV. PRAC. & REM. CODE § 33.004(*l*).

## V.    The Motion to Exclude Expert Opinion Testimony

Forecast recently filed motions to exclude the expert testimony of Nguyen, (Docket Entry No. 98), John Pirotte and Alton Davis, (Docket Entry No. 99), and Ambriz, (Docket Entry No. 100). Axxiom has not responded, though its time for response has not yet expired.  The court will consider the motions at the discovery hearing scheduled for 10:00 a.m. on February 1, 2012 in Courtroom 11-B.

## VI.    Conclusion

Forecast's motion for partial summary judgment on the copyright-infringement claims, (Docket Entry No. 94), is granted.  Axxiom's cross-motion, (Docket Entry No. 49), is denied. Forecast's motion for partial summary judgment on the Lanham Act and state-law claims, (Docket Entry No. 62), is denied.  Forecast's motion to strike certain evidence, (Docket Entry No. 67), is denied.  Forecast's motion for leave to designate responsible third parties, (Docket Entry No. 95), is granted in part.  The pending motions to exclude expert testimony, (Docket Entry Nos. 98–100), will be addressed at the discovery hearing scheduled for 10:00 a.m. on February 1, 2012 in Courtroom 11-B.

SIGNED on January 31, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

34